Cite as 2020 Ark. 371

# SUPREME COURT OF ARKANSAS
No. CR-20-249

|  |  |  |
|---|---|---|
|  |  | **Opinion Delivered:** November 12, 2020 |
| MICHAEL COLLINS | APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FOURTH DIVISION [NO. 60CR-18-770] |
| V. |  |  |
| STATE OF ARKANSAS | APPELLEE | HONORABLE HERBERT T. WRIGHT, JR., JUDGE |
|  |  | AFFIRMED; REMANDED TO CORRECT THE SENTENCING ORDER. |

**SHAWN A. WOMACK, Associate Justice**

Appellant Michael Collins and his accomplice, William Alexander, were charged with three counts of capital murder and one count of aggravated robbery. Collins was tried individually and convicted by a Pulaski County Circuit Court jury on all counts. For reversal, Collins argues the circuit court (1) erred in denying his motion for directed verdict, and (2) abused its discretion in admitting autopsy photographs after he offered to stipulate the cause of death. We affirm.

I. *Background*

On December 4, 2017, Collins and his half-brother, Alexander, broke into Mariah Cunningham's apartment in search of money they believed to be in her possession. Unable to locate the money, the two men waited for Cunningham to return home. Cunningham

returned approximately two hours later with her children, four-year-old Elijah Fisher and five-year-old Aleyah Fisher. Upon entering the apartment, Elijah and Aleyah were repeatedly stabbed by Collins to coerce Cunningham into revealing the money's location. When Cunningham failed to disclose the money's whereabouts, Collins cut her throat and left her and the children dead in the apartment. Collins and Alexander stole a television, video-game console, and Cunningham's white Honda Accord. Shortly thereafter, Collins abandoned the Honda and took a bus to Chicago to stay with his aunt. On December 8, 2017, U.S. Marshals arrested Collins at his aunt's home in Chicago. With Collins were a pair of bloody shoes. DNA testing later established that the blood found on the shoes matched that of all three victims.

While in a federal holding facility in Colorado, Collins confessed the murders to his cellmate, Marino Scott. He told Scott he went to Cunningham's apartment to get money from her. Because Cunningham did not give him money, Collins said he made Cunningham watch as he cut her children's heads off with a knife. Collins also expressed concern that the blood found on his shoes would link him to the murders.

Collins made two subsequent confessions. First, at the Pulaski County Regional Detention Facility, he threatened jail officials who were attempting to remove him from his cell by telling them he had killed three people so he could handle them. Second, Collins confessed to his girlfriend on a recorded phone call made from jail. He told her "the whole thing happened" and went on to say he "did everything. Did this whole nine."

At trial, the State presented a felony-murder theory, with aggravated robbery as the underlying felony. The jury found Collins guilty of three counts of capital murder and one count of aggravated robbery. He was sentenced to life imprisonment on each of the three capital-murder counts. Collins waived jury sentencing on the aggravated-robbery count, and the court sentenced him to an additional 360 months' imprisonment.

## II. *Discussion*

### A. Directed-Verdict Motion

For his first point on appeal, Collins argues the circuit court erred in denying his motion for directed verdict on the capital murder charges involving the deaths of Elijah and Aleyah. Specifically, he contends the State failed to prove he was guilty of the underlying felony of aggravated robbery against the children. According to Collins, the children could not have been robbed because the property stolen from the apartment belonged to their mother.

On appeal, we treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Woods v. State*, 2019 Ark. 62, 567 S.W.3d 494. In reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict is supported by substantial evidence, direct or circumstantial. *Starling v. State*, 2016 Ark. 20, 480 S.W.3d 158. Substantial evidence is evidence that is forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture. *Anderson v. State*, 2011 Ark. 461, 385 S.W.3d 214. The evidence is viewed in the light most favorable to the State, considering only evidence that supports the verdict. *Mercouri v. State*, 2016 Ark. 37, 480 S.W.3d 864.

3

Collins was convicted of one count of aggravated robbery and three counts of capital murder. A person commits aggravated robbery if he commits a robbery and is armed with a deadly weapon or inflicts or attempts to inflict death or serious physical injury upon another person. Ark. Code Ann. § 5-12-103(a)(1), (3) (Repl. 2013). A robbery is committed when a person, with the purpose of committing felony or misdemeanor theft, employs or threatens to immediately employ physical force upon another person. Ark. Code Ann. § 5-12-102(a). Collins committed capital-felony murder if he committed or attempted to commit aggravated robbery and, in the course of and in furtherance of the aggravated robbery, Collins or an accomplice caused the death of the victims under circumstances manifesting extreme indifference to the value of human life. Ark. Code Ann. § 5-10-101(a)(1)(A)(vi), (B).

In a capital-felony murder case, the State must first prove the felony, so the felony becomes an essential element of the murder charge. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001). Thus, a felony-murder conviction requires proof that the death was caused in the course of committing the aggravated robbery. *See Williams v. State*, 2017 Ark. 287, 528 S.W.3d 839. A strict causal relationship between the felony and the murder is unnecessary; rather, "the State need only prove that the robbery and the murder were parts of the same transaction or occurred within the same brief interval." *See Norris v. State*, 2010 Ark. 174, at 6, 368 S.W.3d 52, 56 (quoting *Clay v. State*, 324 Ark. 9, 12, 919 S.W.2d 190,191–92 (1996)).

Collins now urges this court to extend to his case the rationale of *Mitchell v. State*, 281 Ark. 112, 661 S.W.2d 390 (1983). In *Mitchell*, an employee at a pizza restaurant gave robbers money belonging to the business as well as his personal property, resulting in two convictions

of aggravated robbery. This court set aside the conviction and sentence for one of the counts of aggravated robbery, observing that under the current statute, "aggravated robbery was complete with the threat of physical harm and the intent to commit theft. Therefore, the same proof was required for each of the counts of robbery." *Id*. at 113–14, 661 S.W.2d at 392. Collins asserts *Mitchell* supports his contention that property taken from the apartment could not have been robbed from multiple persons. We note Collins did not argue in his directed-verdict motion that *Mitchell* should extend to his case. Further, *Mitchell* undermines the point Collins is attempting to make--that aggravated robbery could not be proved with regard to Elijah and Aleyah because they did not own the stolen property. We stated that "[o]wnership is not a necessary element of proof for aggravated robbery." *Id*. at 114, 661 S.W.2d at 392; *see also Williams v. State*, 351 Ark. 215, 225, 91 S.W.3d 54, 60 (2002) ("[N]o transfer of property needs to take place to complete the offense."). Consequently, the fact that the stolen property did not belong to the children is of no moment. The State needed only to prove Collins had the requisite intent to commit the robbery during the brief interval in which the murders occurred.

Notably, Collins concedes there is sufficient evidence of his involvement in the murders, and Scott testified that Collins told him he went to Cunningham's apartment to get money. Following the murders, Collins took a television, video-game console, and car from the premises. Viewing the evidence in the light most favorable to the State, there is substantial evidence that Collins killed Elijah and Aleyah in the course of and in furtherance

5

of the robbery. Therefore, we hold the circuit court did not err in denying Collins's motion for directed verdict.

## B. Admission of Photographs

Collins next argues the circuit court abused its discretion by refusing to exclude autopsy photographs. He contends the circuit court should have excluded the photographs based on his offer to stipulate the cause of death and that the court's failure to do so was prejudicial under Arkansas Rule of Evidence 403. Collins further adds the photographs were grotesque and cumulative of crime scene photographs.

We have held the admission of photographs is a matter left to the circuit court's sound discretion, and we will not reverse absent an abuse of that discretion. *Airsman v. State*, 2014 Ark. 500, 451 S.W.3d 565. When photographs are helpful to explain testimony, they are ordinarily admissible. *Id.* The mere fact that a photograph is inflammatory or cumulative is not, standing alone, sufficient reason to exclude it. *Breeden v. State*, 2013 Ark. 145, 427 S.W.3d 5. Even when the cause of death is undisputed, a defendant may not prevent the admission of photographs merely by conceding the facts portrayed therein. *E.g.*, *Smart v. State*, 352 Ark. 522, 104 S.W.3d 386 (2003).

Collins argues *Old Chief v. United States*, 519 U.S. 172 (1997), required the circuit court to accept his stipulation as to the cause of death. In *Old Chief*, the Supreme Court reviewed a felon-in-possession case wherein the defendant had offered to stipulate his status as a convicted felon, but the government was nevertheless allowed to present the order of judgment and conviction for the defendant's prior conviction. The Court reversed, holding

6

the danger of unfair prejudice resulting from the introduction of evidence of the name or nature of the prior offense was too great when the defendant offered to stipulate his status as a convicted felon. *Id.* at 191–92. The Court observed, "The most the jury needs to know is that the conviction admitted by the defendant falls within the class of crimes that Congress thought should bar a convict from possessing a gun, and this point may be made readily in a defendant's admission." *Id.* at 190–91. This court adopted the *Old Chief* rationale in *Ferguson v. State*, 362 Ark. 547, 210 S.W.3d 53 (2005). However, we clarified that this stipulation rule applied only within the narrow context of felon-in-possession-of-a-firearm cases. *Id.* at 555, 210 S.W.3d at 57.

Neither *Old Chief* nor *Ferguson* overruled this court's longstanding precedent that a defendant may not prevent photographs' admission by conceding the facts contained therein, and we see no reason to depart from this standard now. Unlike a felon-in-possession case, in which evidence of the name and nature of a prior conviction are of questionable value to the jury, photographs illustrating the victims' manner of death are central to the State's murder prosecution, adding weight to the crime and eliminating adverse inferences. Generally, the State is entitled to prove its case by evidence of its own choice, and a defendant may not stipulate or admit his way out of the full evidentiary force of the case as the State chooses to present it. *Old Chief*, 519 U.S. at 186; *see also Ferguson*, 362 Ark. at 550, 210 S.W.3d at 54 ("[T]he State has discretion to introduce any relevant evidence to prove its case as conclusively as it can."). Thus, the State may seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors

7

that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault. *Id*. at 188. Here, the State argued the autopsy photographs aided the jury in understanding the nature and degree of the injuries the victims sustained and corroborated witness testimony. Given the discretion afforded the State in presenting its case, we cannot say the circuit court abused its discretion by admitting the autopsy photographs for these purposes.

### III. *Sentencing Order*

Although we affirm Collins's convictions, we remand to the circuit court with directions to correct two clerical errors regarding the aggravated-robbery sentence. First, the order indicates Collins was sentenced by the jury on this count, despite the court's sentencing him for his aggravated-robbery conviction. Second, the sentence is listed as 480 months on the order, but the court announced a thirty-year (360 months) sentence at trial. Accordingly, the circuit court is instructed to correct these two errors found in the sentencing order. *See Perkins v. State*, 2019 Ark. 247, 582 S.W.3d 1.

### IV. *Rule 4-3(i) Review*

In compliance with Arkansas Supreme Court Rule 4-3(i), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Collins. No prejudicial error has been found.

Affirmed; remanded to correct the sentencing order.

HART, J., concurs.

JOSEPHINE LINKER HART, Justice, concurring. I join the majority's opinion affirming this case; I agree that there was no reversible trial error. I write separately to raise my concern over the decision to waive the death penalty in this case. That decision highlights a serious problem with how Arkansas handles capital- murder cases. In my view far too much discretion is vested in a single person––in this case, the prosecuting attorney in Pulaski County who chose to waive the death penalty.

When the Supreme Court of the United States handed down its landmark decision in *Furman v. Georgia*, 408 U.S. 238 (1972), it determined that the death penalty did not per se offend the Eighth Amendment's prohibition against cruel and unusual punishment. However, the *Furman* Court mandated that the death penalty not be arbitrarily, capriciously, or freakishly imposed. The *Furman* Court was especially concerned that imposition of the death penalty adhere to a strict standard of proportionality to the crime.

The *Furman* decision launched a nationwide review of death-penalty statutes and jurisprudence. After the Arkansas General Assembly passed Act 438 of 1973 reinstating the death penalty, this court affirmed the imposition of a death sentence. *Collins v. State*, 259 Ark. 8, 531 S.W.2d 13 (1975). The Supreme Court granted certiorari in that case, vacated the judgment, and ordered that the cause be remanded for further consideration in light of the *Furman* progeny. *Collins v. Arkansas*, 429 U.S. 808 (1976). Upon remand, the Arkansas Supreme Court held that our system of prosecuting and sentencing in capital-felony-murder cases provides constitutionally adequate safeguards against arbitrary, capricious, or freakish imposition of the death penalty for such an offense. *Collins v. State*, 261 Ark. 195, 548

9

S.W.2d 106 (1977). The concern at the time was that there be adequate means of ensuring that the ultimate sanction--death--would not be overprescribed.

In the years since *Furman*, executions have become rarer. According to the Death Penalty Information Center, since the 1970s, nationwide, 1526 men and women have been executed. However, throughout the country, the number of persons on death row has declined in the last two decades. Currently, more inmates are being removed from death row--either their death sentences have been overturned or they die of natural causes-- than are being added each year. Likewise, executions have become increasingly rare. There have been thirty-one executions in Arkansas since 1976, and only four in the last decade. While some may see the paucity of executions as a reason to celebrate, in my view it raises new issues about the proportionality analysis that *Furman* and its progeny require to give effect to the Eighth Amendment's prohibition on cruel and unusual punishment. However, while the number of executions have declined, the number of murders in Arkansas have usually exceeded 200 in the years since *Furman*.[1]

The case before us involves the most heinous crime I have ever had to deal with as a civilian lawyer, an Army Judge Advocate General, and an appellate court judge, a career of nearly fifty years. There was overwhelming evidence of Michael Collins's guilt--strong forensic evidence, a video that placed him at the scene, and his own words that, tragically,

---

[1]The number of murders varied from a high of 294 in 1994, to a low of 142 in 2002. http://www.disastercenter.com/crime/uscrime.htm, archived at https://perma.cc/L3MA-NVYK

revealed not a hint of remorse. The acts that Mr. Collins admitted to were the near decapitation of two young children in their own home, in front of their mother and one of the other victims, for the sole purpose of coercing Mariah Cunningham, the mother of the young children, to reveal the location of a stash of money that Mr. Collins assumed she had. When Ms. Cunningham could not give him the money he wanted, Mr. Collins butchered her as well. Mr. Collins then stole Ms. Cunningham's television and automobile. While the Pulaski County prosecutor rightly filed capital-murder charges against Mr. Collins, astonishingly, he later waived the death penalty. Therein lies the problem.

By not seeking the death penalty, the Pulaski County prosecutor has dramatically raised the floor for future capital-murder cases. As I noted previously, the perpetrator's identity was clear, the act was incredibly deliberate and vicious, the crime took place in the victims' own home, which the perpetrator broke into with the intent to rob, and there were multiple victims, two of which were very young children, ages five and three. If it is not appropriate to seek the death penalty in the case before us, when will it ever be appropriate?

The instant case has convinced me that the decision to seek the ultimate sanction–– death––is too weighty to be left to one person. Perhaps the charging decisions in all homicides should be submitted to a grand jury. The collective wisdom of twenty-four citizens is bound to be more dependable than the opinion of a single person.

Allowing a prosecutor to waive the death penalty should also be reexamined. Capital murder carries two potential sanctions: life imprisonment or death. It is inconsistent with the requirement that juries impose the sentences set forth by the legislature that a county

prosecutor can, on the one hand, overrule an act of the legislature and strike one of the sentencing options and, simultaneously, take from the jury its duty to impose what it believes is a just sentence.

Finally, to effect statewide consistency in how Arkansas charges, tries, and punishes homicides, perhaps the prosecution of homicides needs to be elevated to the office of the Attorney General. It is essential that a crime like the one in the case before us receive the same treatment in Pulaski County as it would in Washington County. Otherwise, how can it honestly be said that the death penalty in Arkansas is not arbitrarily, capriciously, or freakishly applied, as the Eighth Amendment requires.

I concur.

*Jeff Rosenzweig*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christopher R. Warthen*, Ass't Att'y Gen., for appellee.